USA v. Chappell                    CV-98-524-M    06/15/00
                    UNITED STATES DISTRICT COURT

                     DISTRICT OF NEW HAMPSHIRE


United States of America,
        Plaintiff

        v.                              Civil No. 98-524-M
                                        Opinion No. 2000 DNH 138
Ronald C. Chappell and
Susan L. Chappell,
        Defendants


                        **O R D E R**


        The United States, through the Farm Service Agency ("FSA"),

a successor to the Farmers Home Administration ("FmHA"), seeks a

deficiency judgment against defendants Ronald and Susan Chappell,

after having foreclosed on defendants' dairy farm.  The

government has moved for summary judgment, saying it is entitled

to judgment as a matter of law in the amount of approximately

$140,000, plus accumulating interest.  Defendants, who are

proceeding pro se, object and have themselves moved for summary

judgment, asking that "all monies collected from offset by [the

government] be returned."  Defendants' motion for summary

judgment (document no. 12) at 1.

## Background

Briefly stated, the material facts appear as follows. In 1982, the FmHA extended financing to defendants so that they might purchase a dairy farm in Colebrook, New Hampshire. The FmHA secured its $92,000 loan to defendants through a mortgage deed on the property.

Almost immediately after purchasing the property, defendants encountered numerous unanticipated problems, including seriously ill cattle, structural problems with the barn, plumbing and electrical problems with the house and barn, and a non-functioning septic system. With financial assistance from the FmHA, they sued the people from whom they purchased the farm and apparently settled their claims short of trial. Nevertheless, those problems, combined with a decline in the profitability of dairy farming in the area, a high mortality rate in their herd, and low milk output, caused defendants to incur substantial cash flow difficulties and apparently prevented them from paying approximately nine years' worth of state real estate taxes. The

2

record suggests that the government assisted defendants by making tax payments on their behalf (averaging between $2,500 and $3,000 per year). Monies used to satisfy defendants' state tax obligations were added to their total indebtedness to the FmHA.

In 1985, the FmHA refinanced defendants' loan to help them stay current. Then, in 1986, and again in 1987, the FmHA extended defendants additional credit, in the form of a $1,000 and then a $4,000 dollar loan. In 1988, defendants' obligations to the FmHA were secured by a new mortgage deed. On November 22 of that year, however, defendants again stopped making payments on their obligations to the government. Approximately three and one-half years later, in March of 1992, the FSA accelerated defendants' obligations, essentially demanding that they immediately pay the full amount owed to the government. Defendants apparently remained in default and made no further payments. Roughly one year later, in May of 1993, defendants abandoned the property.

More than 18 months after defendants abandoned the property, and more than six years after they defaulted, FSA finally foreclosed on the farm.  The foreclosure sale yielded $40,000.  Notwithstanding the fact that defendants paid in excess of $90,000 for the farm in 1982, and made substantial improvements to it, the government says the relatively modest amount received at the foreclosure sale was reasonable due to several factors, including a downturn in the local economy and real estate market, a decline in the profitability of dairy farms in the area, waste and mismanagement by defendants, and the general deterioration of the property since defendants abandoned it in 1993.

The government now seeks the balance of the sums owed by defendants, which, as of December 9, 1998, it calculates to be $138,616.58, with interest accumulating at the rate of about $13.17 per day.  That sum represents defendants' total indebtedness to the government, less the $40,000 obtained at foreclosure.

4

Although defendants do not directly challenge the procedural aspects of the foreclosure sale, they do interpose several objections to the government's motion for summary judgment. None of defendants' objections appears to have much legal merit, but then defendants are not schooled in the law and the case no doubt appears complex to them. Nevertheless, the court concludes that several unresolved legal and factual matters apparent in the record preclude the entry of judgment as a matter of law in favor of the government, at least at this point.

## Discussion

The record suggests that the FmHA and FSA made an effort over the years to assist defendants in making their dairy farm profitable. The affidavit submitted by Patrick Freeman, the Farm Loan Chief of the FSA, summarizes some of those efforts:

> The FSA did not simply give up on this family and cut off their financing; instead it worked with them to resolve their problems through additional funding, rewriting loans, and advancing money for nine years' worth of real estate taxes to save the farm from being sold at tax sale. FSA also assisted the family through forbearance. For example, payments due FSA through a

5

> milk assignment were returned to them, while other
> creditors were being paid as agreed; FSA accepted
> interest payments only on new loans to help the family
> build up their operation; FSA made new loans to the
> family after protective advances were made to buy feed
> for cows which the Chappells could not afford to buy.

Affidavit of Patrick Freeman, submitted with the government's motion for summary judgment, at para. 10.

While there appears little doubt that defendants are, in fact, obligated to repay at least a portion of the outstanding amount claimed by the government, the precise amount owed remains uncertain. That uncertainty arises from issues concerning the timing of some of the government's actions in this case. For example, the following question presents itself: Whether the government had an obligation to preserve the value of the assets securing defendants' obligations (i.e., the farm, structures, equipment, cattle, and related assets) by acting in a more timely fashion to foreclose upon those assets.

Defendants defaulted on their obligations to the government in 1988 and yet the government did not foreclose on the farm until more that six years later. In the interim, the local real estate market suffered an enormous downturn, causing the failure of several major New Hampshire banks. More significantly, defendants abandoned the property, which appears to have been left unattended for at least 18 months prior to the foreclosure sale. That, in turn, appears to have caused the property to deteriorate substantially and may well have contributed substantially to the low price at which defendants' farm was eventually sold at foreclosure.

One might reasonably posit that if the government foreclosed on the property within a reasonable time after defendants defaulted in 1988, or after defendants' obligations were accelerated in 1992, or, at a minimum, after defendants abandoned the farm in 1993, the sums recovered at a foreclosure sale (which would have been conducted prior to any deterioration suffered during the 18 month period during which the property was

7

unattended) would likely have been much higher than the $40,000 eventually recognized. That, in turn, would have reduced the outstanding obligations owed by defendants.

To be sure, there may be entirely plausible, reasonable, and even laudatory reasons why the government did not foreclose on the farm sooner. On that point, however, the record is silent. And, the record does not disclose what obligation (if any) the government might have had to act in a more speedy manner, aimed at preserving the value of the loan's security, particularly as time went on and it became apparent that New Hampshire was plunging into a severely depressed real estate market, and in light of the fact that, despite the best efforts of defendants and the government, it certainly appeared that defendants would never be able to make the farm self-sustaining.

Under New Hampshire law, a foreclosing "mortgagee's duty of good faith and due diligence is essentially that of a fiduciary. . . . A mortgagee, therefore, must exert every reasonable effort

8

to obtain a 'fair and reasonable price under the circumstances.'" Murphy v. Financial Development Corp., 126 N.H. 536, 541 (1985) (citation omitted). The precise point in time at which that duty attaches is unclear. It is undeniable that it attaches once a mortgagee decides to foreclose on any asset(s) pledged as security for an underlying loan. It is, however, conceivable that the government had some obligation (perhaps short of a fiduciary duty) to protect the value of that security even before it decided to foreclose. That is to say, if a reasonable lender would have reasonably concluded, say in 1988 (when defendants defaulted) or even 1993 (when defendants abandoned the property), that defendants were unlikely to ever make the farm self-sustaining, the government might well have been obligated to conduct the foreclosure at or about that time. Had the government done so, it would have foreclosed on defendants' farm while it was still occupied or, at a minimum, before it had been left abandoned for 18 months. Certainly a larger sum would probably have been realized at the foreclosure sale if it had occurred before 18 months of neglect ran its course.

9

## Conclusion

The current record contains unresolved legal and factual issues that the parties have yet to address including, at a minimum, the following:

1.  Whether, as a factual matter, it was commercially reasonable for the government to delay foreclosure on defendants' farm for more than six years after defendants defaulted on their obligations, particularly in light of evidence suggesting that, notwithstanding substantial assistance and forbearance from the government, it appeared that defendants would not be able to make the farm a viable and self-sustaining business.

2.  Whether, as a factual matter, it was commercially reasonable for the government to delay foreclosure on defendants' farm for more than a year and one-half after defendants abandoned the property.

3.  Whether the government had a legal obligation to take reasonable steps aimed at preserving the value of the farm which secured defendants' obligations (and thereby minimize the deficiency judgment to which defendants might be exposed).

3.  Whether the government had a legal obligation to foreclose on defendants' farm in a more timely manner.

4.  Whether the government, along with defendants, must share in some of the farm's depreciated value (evidenced by the sum realized at foreclosure) as

10

a result of its delay in bringing foreclosure proceedings.

The current record is insufficiently developed to permit resolution of those factual issues. And, because neither party has had an opportunity to address the legal issues raised in this order, it would be premature for the court to resolve them.

In light of the foregoing, the court concludes that existence of genuine issues of material fact precludes it from entering judgment as a matter of law in favor of the government. According, its motion for summary judgment (document no. 11) is denied, without prejudice. Likewise, defendants' motion for summary judgment (document no. 12) is denied, without prejudice.

SO ORDERED.

_____
Steven J. McAuliffe
United States District Judge

June 15, 2000

cc:  David L. Broderick, Esq.
     Ronald C. Chappell
     Susan L. Chappell

11